# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

DONNIE A. LONG,

       Plaintiff,

                                          **Civil Action 2:18-cv-00597**
                                          **Judge Sarah D. Morrison**
       v.                                  **Chief Magistrate Judge Elizabeth P. Deavers**

COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Donnie A. Long ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Social Security Disability Insurance benefits ("SSDI"). This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 11), the Commissioner's Memorandum in Opposition (ECF No. 15), Plaintiff's Reply (ECF No. 17), and the administrative record (ECF No. 7). For the following reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.  BACKGROUND

Plaintiff applied for disability benefits on December 12, 2015. (R. at 170–71.) Plaintiff's claim was denied initially and upon reconsideration. (R. at 19.) Upon request, a hearing was held on May 30, 2017, in which Plaintiff, represented by counsel, appeared and testified. (R. at 47–62.) A vocational expert also appeared and testified at the hearing. (R. at 58–61.) On

August 17, 2017, Administrative Law Judge Peter Beekman ("the ALJ") issued a decision

finding that Plaintiff was not disabled at any time after June 3, 2010, the alleged onset date. (R.

at 16–29.) On April 17, 2018, the Appeals Council denied Plaintiff's request for review and

adopted the ALJ's decision as the Commissioner's final decision. (R. at 1–6.) Plaintiff then

timely commenced the instant action. (ECF No. 4.)

## II. HEARING TESTIMONY

### A. Plaintiff's Testimony

Plaintiff stated that he is five feet and ten inches tall and weighs 247 pounds. (R. at 49.)

Plaintiff testified that he became disabled on June 3, 2010. (R. at 48.) He stated that he was

working as a "tank fitter, welder and after [he] got the power and stuff while [he] was in the tank

they told [him] to roll it and . . . it was on two two-by-fours and they rolled it off. Then, when

[he] got done, they told [him to] go ahead and try to roll it back up there. When [he] did, it

jerked [his] left arm and [his] arm went numb and [he] didn't get to stay there very long that day

after because [his] whole left arm, hand and stuff, was going numb afterwards." (*Id.*) Besides

his left arm, Plaintiff testified that he also has problems with his right arm and shoulder, because

when he hurt his left side he "tried to do a lot of the stuff with [his] right one" and "now, it's

hurting about as bad as [his] left one is." (R. at 49.) Plaintiff also testified that he has high blood

pressure. (*Id.*)

Plaintiff stated he drives "very little" because "steering the car hurts [his] shoulders." (R.

at 50.) Plaintiff described his average day as waking up then drinking "a couple of cups of

coffee," going out and sitting on the porch, maybe walking around the yard one time, sitting in

the house and watching television until his shoulders start "hurting so bad" that he must go to

bed.  (R. at 51.)  Plaintiff testified that he is unable to pull or push anything with his left arm

because he gets "definitely sick if [he tries] to pull or push with [his] left arm."  (*Id.*)

Plaintiff further testified that he experienced a couple strokes in 2015.  (R. at 52.)

Plaintiff stated that he has memory problems including being unable to remember to take his

medication.  (*Id.*)  Plaintiff also stated that he is "about blind" in his left eye "because of the

strokes."  (R. at 53.)  Plaintiff testified that depression affects him "at least three days a week."

(R. at 54.)  Plaintiff further testified that he has received some treatment for his depression at Six

County.  (*Id.*)

### B.  Vocational Expert Testimony

Brett Salkin testified as the vocational expert ("VE") at the May 2017 hearing.  (R. at 58–

61.)  The VE testified that Plaintiff had past work as a bulldozer operator, skilled, with a heavy

exertion demand.  (R. at 58.)  The VE also testified that Plaintiff had past work of welder-fitter,

skilled, classified as medium, and past work in a dry wall installer job, skilled, classified as very

heavy exertion.  (R. at 58–59.)  The VE further testified that there are no transferable skills from

any of Plaintiff's past work positions to the light level.  (R. at 59.)

The ALJ asked the VE to assume a hypothetical person with Plaintiff's age, education,

and past work; who can lift/carry twenty pounds occasionally and ten pounds frequently; can

stand or walk six hours out of an eight-hour workday; can sit six hours out of an eight-hour

workday; can push/pull ten pounds occasionally; whose foot pedal is constant; can constantly use

a ramp or stairs but never a ladder, rope, or scaffold; can constantly balance, kneel, and crouch;

can occasionally stoop and crawl; with right upper extremity overhead and all plains constant;

with bilaterally, handling, fingering, and feeling constant; with no visual limitations; with no

communication deficient; who should entirely avoid dangerous machinery and unprotected

heights; who can do tasks that would take a limit of three months to learn; can do simple routine

tasks with no high production quotas or piece-rate work; whose job should not involve

arbitration, confrontation, negotiation, supervision, or commercial driving; and who should have

only supervised interpersonal interactions with the public and co-workers and the contact that is

had should be a short duration of five minutes per person and for a definite purpose. (R. at 59–

60.) Assuming those limitations, the VE testified the individual could not perform Plaintiff's

past work but could work as an usher, unskilled, light exertion; a furniture rental clerk, unskilled,

light exertion; and school bus monitor, unskilled, light exertion. (R. at 60.) The VE testified that

if the individual was off task more than ten percent during the day then that person could not

sustain competitive employment. (R. at 61.)

### III. RELEVANT MEDICAL RECORDS

#### A. Richard L. Odor, Ph.D.

On February 12, 2014, Dr. Odor completed an Independent Medical Evaluation of

Plaintiff. (R. at 1116–21.) Dr. Odor noted that rapport with Plaintiff was easily developed, his

demeanor was friendly, and he utilized appropriate social amenities. (R. at 1118.) Dr. Odor

further noted that Plaintiff was oriented in all spheres and fully alert, his stream of thought was

logical, coherent, and goal-directed, and his speech was clear. (*Id.*) Dr. Odor also indicated that

Plaintiff's mood was mildly sad, as evidenced by the content of his verbalizations, and his affect

was mildly restricted in range. (*Id.*) Dr. Odor noted that there was no overt evidence of mania,

hallucination, or delusion. (*Id.*)

At the exam, Plaintiff described his general mood as "I get aggravated pretty easy." (*Id.*)

Dr. Odor noted that questioning revealed Plaintiff experienced a depressed mood "at least every

other night" and showed marked diminished interest/pleasure, had a decreased appetite, a

delayed onset of sleep, a low energy level, a diminished ability to concentrate, and suicidal ideation.  (*Id.*)  Plaintiff also reported experiencing panic symptoms about once a month and increased irritability with occasional chest discomfort.  (*Id.*)  Dr. Odor further noted that the record indicated that Plaintiff began experiencing depression in about 2012.  (*Id.*)

Plaintiff completed the Beck Depression Inventory II ("BDI-II") and scored 41, which is in the severe range of depression.  (R. at 1119.)  The following were indicated at the "highest level" for Plaintiff:  pessimism, past failure, punishment feelings, loss of interest, indecisiveness, irritability, and concentration difficulty.  (*Id.*)  The following were indicated at the "moderate level" for Plaintiff:  loss of pleasure, guilty feelings, suicidal thoughts, agitation, worthlessness, changes in appetite, tiredness/fatigue, and loss of interest in sex.  (*Id.*)

Plaintiff also completed the Brief Battery for Health Improvement 2 ("BBHI2").  (*Id.*)  Dr. Odor noted that the BBHI2 results raised the possibility that some symptom magnification may be present for Plaintiff.  (*Id.*)  He further noted that a high level of depressive thoughts and feelings were reported by Plaintiff, as well as severe anxious thoughts and feelings.  (*Id.*)  Dr. Odor indicated that Plaintiff's depressive thoughts and feelings were reported at a higher level than is seen in 88% of patients, and Plaintiff's anxious thoughts and feelings were reported at a higher level than is seen in 96% of patients.  (*Id.*)  Dr. Odor further indicated that the reported depression and anxiety may be Plaintiff reacting to his physical condition.  (*Id.*)  Dr. Odor also noted the following regarding the BBHI2:

> [Plaintiff's] level of somatic complaints is not unusual for a medical patient.  A high level of perceived disability was reported at a level higher than that seen in 85% of patients.  He reported his maximum tolerable pain which would allow him to perform regular life activities is 2/10.  This may explain the possible symptom magnification and high level of perceived functional complaints.  Overall, the BBHI2 is consistent with a significant depressive experience.

(*Id.*)

Finally, Dr. Odor noted that he has not provided any care for Plaintiff. (R. at 1121.) He further noted that he has seen Plaintiff only one time, and only for the purpose of evaluating psychological impairment. (*Id.*) He also noted that the opinions in his report "are stated with a reasonable degree of psychological certainty." (*Id.*)

**B. Jennifer Stoeckel, Ph.D.**

Dr. Stoeckel saw Plaintiff for a psychological assessment on January 7, 2015. (R. at 1123.) Dr. Stoeckel noted that Plaintiff related in a friendly and cooperative manner, was generally articulate, and had an affect that appeared to be blunted and flat. (R. at 1126.) Plaintiff reported that he is depressed everyday because he cannot do much and was used to working because he worked since he was fourteen-years-old. (*Id.*) Plaintiff also reported that he gets anxiety attacks, gets aggressive, gets agitated, and gets "real nervous," but that it is "not as bad as it was" and that medication is "helping some." (*Id.*) Additionally, Plaintiff reported fatigue, feelings of worthlessness, loss of interest, social isolation, irritability, frequent tearful episodes, chronic tension, problems with memory, concentration, and focus, and problems with crowds. (*Id.*) He denied any history of suicidality. (*Id.*)

Dr. Stoeckel noted that Plaintiff's score on the Depression scale "suggests that he is more depressed than the average pain patient." (R. at 1127.) She also noted that his score on the Somatization scale "suggests that he has more physical problems, pain, and health related concerns than the average pain patient." (*Id.*) She further noted that his score on the Anxiety scale "suggests that he is more anxious than the average pain patient." (*Id.*) Dr. Stoeckel concluded that Plaintiff was evidencing moderately severe levels of depression, along with mood lability, tension, poor frustration tolerance, agitation, diminished concentration, as well as vegetative symptoms of depression. (R. at 1128.)

6

### C. Deborah Koricke, Ph.D.

On September 27, 2016, Dr. Koricke completed a psychological evaluation of Plaintiff. (R. at 1130–36.)  Plaintiff denied ever having treatment for mental health issues prior to his work injury.  (R. at 1131.)  Plaintiff reported suffering from difficulties with an overly sad/depressed mood, tearful moods, sleep disturbances, difficulties with energy and motivation, isolating himself from others, loss of pleasure in activities that were once enjoyable, and suicidal thoughts. (*Id.*)  Dr. Koricke noted that Plaintiff presented with a blunted affect and a depressed mood.  (R. at 1132.)  Dr. Koricke further noted that Plaintiff scored a 38 on the BDI-II, indicating that his depression is in the severe range.  (R. at 1133.)  Dr. Koricke also noted that Plaintiff scored a 26 on the Beck Anxiety Inventory, indicating that his anxiety is in the moderate range.  (*Id.*) Plaintiff scored a 15 on the Beck Hopelessness Scale, indicating that he is experiencing a severe range of hopelessness.  (*Id.*)

Dr. Koricke concluded that Plaintiff presents with symptoms of depression which continue to vary in acuity and intensity.  (R. at 1134.)  She further concluded that despite Plaintiff's "best efforts and the efforts of his providers, he will likely continue to have residual symptoms of depression for the foreseeable future due to the permanence of his physical injuries and ongoing issues with pain."  (*Id.*)  Dr. Koricke also concluded that Plaintiff "will likely continue to suffer from residual symptoms which will wax and wane due to the permanent nature of his physical injuries."  (*Id.*)  Dr. Koricke noted that Plaintiff presents as a moderately depressed man, but his testing indicates that he perceives he is experiencing severe depressive symptoms.  (R. at 1135.)  She concluded that he could not return to his former position of employment from a psychological perspective.  (*Id.*)  She further concluded that Plaintiff, at the time of the evaluation, would not be an appropriate candidate for vocational rehabilitation due to

the continued acuity of his depressive symptoms. (*Id.*) She noted that he has unsuccessfully attempted vocational rehabilitation in the past. (*Id.*) She also noted that the basis for her psychological opinion was "largely based on presentation at the time of [Plaintiff's] evaluation." (R. at 1134.)

### D. Obesity

On December 15, 2009, Plaintiff stated his weight was 230 pounds when he was seen by Frederic A. Humphrey, D.O. at Memorial Health System. (R. at 729.) On June 16, 2010, in an initial patient assessment at First Settlement Orthopaedic Surgery & Sports Medicine, Plaintiff's height was noted at sixty-nine-and-one-half inches and his weight was noted at 220 pounds. (R. at 387, 417, 419.) On July 21, 2010, Plaintiff was seen at the Marietta Memorial Hospital Emergency Department and his weight was recorded at 222 pounds and his height was recorded at sixty-nine inches. (R. at 773.) Ten days later, on July 31, 2010, Plaintiff was again seen at the Marietta Memorial Hospital Emergency Department and his weight was recorded at 226 pounds and his height was recorded at sixty-nine inches. (R. at 779.) On the same day at the Marietta Memorial Hospital Emergency Department, Plaintiff's general appearance was described as "somewhat overweight, well hydrated, alert, cooperative, no obvious discomfort." (R. at 780.)

Plaintiff was again seen at the Marietta Memorial Hospital Emergency Department on February 23, 2011. (R. at 813.) His weight was recorded at 246 pounds and his height was recorded at seventy inches. (*Id.*) On May 22, 2011, Plaintiff's weight was recorded at 245 pounds and his height was recorded at seventy inches when he was seen at the Marietta Memorial Hospital Emergency Department. (R. at 818.) On July 6, 2011, at the Marietta Memorial Hospital Emergency Department, Plaintiff's weight and height were recorded at 240 pounds and seventy inches, respectively. (R. at 826.) Plaintiff was again seen at the Marietta

Memorial Hospital Emergency Department on August 10, 2011, where his weight was recorded at 240 pounds and his height was recorded at seventy inches. (R. at 833.)

Plaintiff was seen by Kirby J. Flanagan, M.D. on September 6, 2011, where his weight was recorded at 240 pounds and his height was recorded at seventy inches. (R. at 1102, 1104.) Plaintiff's weight was recorded at 245 pounds and his height was recorded at seventy inches when he was seen at the Marietta Memorial Hospital Emergency Department on October 4, 2011. (R. at 839.) On the same day, Plaintiff's general appearance was noted as "somewhat overweight, no acute distress, obvious mild discomfort." (R. at 841.) Plaintiff underwent surgery on March 19, 2012. (R. at 560–82.) His weight was recorded at 254 pounds and his height at seventy inches and 250 pounds and seventy inches in the same paperwork. (R. at 564, 566, 587.) His Body Mass Index ("BMI") was recorded at 36.47 kg/meters squared. (R. at 564, 566.) On September 16, 2012, during a visit to the Muskingum Valley Health Center, Plaintiff's weight was recorded as 255.6 pounds. (R. at 618.)

In September 2012, David Klein, M.D. recorded Plaintiff's BMI as 40.77 kg/meters squared and noted Plaintiff's BMI was above average. (R. at 1048.) In December 2012, Dr. Klein recorded Plaintiff's BMI as 35.65 kg/meters squared and noted the BMI was above average and that Plaintiff had been advised to work on diet and exercise at home. (R. at 1050.) In March 2013, Dr. Klein indicated the same BMI for Plaintiff as in December 2012, again noting that it was above average. (R. at 1052.) Plaintiff was seen at Quality Evaluations, Inc. on April 30, 2013, where his weight was record at 254 pounds. (R. at 1108–09.) In July 2013, Dr. Klein recorded Plaintiff's BMI as 34.49 kg/meters squared and noted this was an elevated BMI. (R. at 1054.) In November 2013, Dr. Klein recorded Plaintiff's BMI as 34.9 kg/meters squared and noted he discussed Plaintiff's elevated BMI with him. (R. at 1059.) Dr. Klein recorded

Plaintiff's BMI at 35.47 kg/meters squared in November 2014. (R. at 1061.) In April 2014, Dr.

Klein recorded Plaintiff's BMI at 33.91 kg/meters squared. (R. at 1063.) Dr. Klein recorded

Plaintiff's BMI at 32.87 kg/meters squared in July 2014 and advised Plaintiff to follow a dietary

handout that was provided. (R. at 1065.) Also in July 2014, Ashley Lockhart, PA, recorded

Plaintiff's BMI at 32.72 kg/meters squared and noted she discussed his elevated BMI with him.

(R. at 1067.) In August 2014, Ms. Lockhart recorded Plaintiff's BMI at 33.43 kg/meters

squared. (R. at 1070.) In October 2014, she recorded his BMI at 34.01 kg/meters squared. (R.

at 1072.)

On December 18, 2014, Plaintiff was seen at Marietta Memorial Hospital where his

general appearance was noted as "no acute distress, overweight." (R. at 854.) Plaintiff was seen

by Carl Schowengerdt, M.D. on January 21, 2015, who indicated that Plaintiff "is overweight,

pleasant and cooperative" and recorded Plaintiff's BMI as 34.85 kg/meters squared. (R. at 879,

1074.) On the same day, Dr. Stoeckel wrote a letter describing her evaluation of Plaintiff where

she indicted that Plaintiff reported he weighs 230 pounds but had lost twenty pounds in the past

three months due to diminished appetite. (R. at 1123–28.) On February 6, 2015, Dr. Klein

recorded Plaintiff's weight as 246 pounds and BMI as 35.38 kg/meters squared. (R. at  872.)

Natalie A. Meyer, Psy.D. completed a Psychological Evaluation on Plaintiff on March

27, 2015. (R. at 883–88.) She recorded Plaintiff's weight at 235 pounds and his height at

seventy inches. (R. at 885.) She also noted that Plaintiff denied any recent weight loss and

concerns about appetite. (*Id.*) On April 13, 2015, Dr. Michael Delphia indicated in his

Disability Determination that Plaintiff's self-reported weight was 235 pounds and self-reported

height was seventy inches. (R. at 63–64.) Plaintiff was seen at Marietta Memorial Hospital on

August 4, 2015 by Gary Oates, M.D., who indicated that Plaintiff's general appearance was "no

acute distress, normal weight." (R. at 942, 944.) One day later, Dr. Klein recorded Plaintiff's BMI as 34.44 kg/meters squared and noted he discussed Plaintiff's elevated BMI with him. (R. at 920.) One day after that, on August 6, 2015, Plaintiff was again seen at Marietta Memorial Hospital by William A. Fogle, M.D., who indicated Plaintiff's general appearance was "no acute distress, overweight." (R. at 983, 985.)

On August 16, 2015, Plaintiff presented to the emergency department at Marietta Memorial Hospital complaining of nausea and mild upper abdominal pain. (R. at 1007.) In the report from this visit, Plaintiff's general appearance was noted as "no acute distress, obese." (R. at 1009.) Plaintiff was seen by Jaimee C. Lent, D.O. at Marietta Memorial Hospital on December 15, 2015. (R. at 1029.) His general appearance was noted as "no acute distress, overweight." (R. at 1031, 1036 (noting Plaintiff's general appearance as "overweight").) At the same visit, Plaintiff's weight was recorded at 235 pounds and his height was recorded at seventy inches. (R. at 1034, 1037.) On September 4, 2015, Dr. Klein recorded Plaintiff's BMI as 34.01 kg/meters squared and noted he discussed the elevated BMI with Plaintiff. (R. at 935.) On November 6, 2015, during a visit to Muskingum Valley Health Centers, Plaintiff's BMI was recorded at 35.79 kg/meters squared. (R. at 1080–81.)

On February 5, 2016, during a visit at Muskingum Valley Health Centers, Plaintiff's BMI was recorded at 36.16 kg/meters squared. (R. at 1084.) On a May 5, 2016 visit to Muskingum Valley Health Centers, Plaintiff's BMI was recorded at 35.58 kg/meters squared. (R. at 1087.) On August 5, 2016, Plaintiff was seen at Muskingum Valley Health Centers where he stated that he was gaining weight and his BMI was recorded at 35.27 kg/meters squared. (R. at 1090–91.) On August 18, 2016, Plaintiff was seen by Mukesh, Rangwani, M.D. and his weight was recorded at 248 pounds. (R. at 1141–42.) At a September 27, 2016 psychological evaluation at

the Center for Effective Living, Plaintiff's weight was recorded at approximately 249 pounds and his height at approximately sixty-seven inches.  (R. at 1130, 1132.)

On February 9, 2017, during a visit to Muskingum Valley Health Centers, Plaintiff's BMI was recorded at 36.01 kg/meters squared.  (R. at 1217–18.)  Plaintiff was seen at Marietta Memorial Hospital by Mario, Estolano, M.D. on February 22, 2017, who noted that Plaintiff's general appearance was "no acute distress, overweight."  (R. at 1147, 1149.)  At the same visit, his weight was recorded at 247 pounds and his height at seventy inches.  (R. at 1162, 1166.)  On March 8, 2017, Plaintiff's BMI was recorded as 36.16 kg/meters squared during a visit to Muskingum Valley Health Centers.  (R. at 1221–22.)  On March 10, 2017, Plaintiff was seen by Dr. Klein who indicated "obese; no distended" regarding an exam of Plaintiff's gastrointestinal tract.  (R. at 1228–30.)  Furthermore, Dr. Klein indicated that Plaintiff's "nutritional appearance" was "average body habitus and obese."  (R. at 1230.)  At the May 30, 2017 hearing in front of the ALJ, Plaintiff testified that he is five feet and ten inches (i.e., seventy inches total) tall and weighs 247 pounds.  (R. at 49.)

### IV. ADMINISTRATIVE DECISION

On August 17, 2017, the ALJ issued his decision.  (R. at 16–29.)  At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantial

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

    1.      Is the claimant engaged in substantial gainful activity?
    2.      Does the claimant suffer from one or more severe impairments?
    3.      Do the claimant's severe impairments, alone or in combination, meet or
                equal the criteria of an impairment set forth in the Commissioner's Listing of
                Impairments, 20 C.F.R. Subpart P, Appendix 1?
    4.      Considering the claimant's residual functional capacity, can the claimant

gainful activity since June 3, 2010, the alleged onset date. (R. at 21.) The ALJ found that

Plaintiff has the following severe impairments: left upper extremity injury; cerebro-vascular

accident; degenerative joint disease; affective disorder; and major depressive disorder. (*Id.*) The

ALJ further found that Plaintiff did not have an impairment or combination of impairments that

meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1. (R. at 21–22.)

At step four of the sequential process, the ALJ set forth Plaintiff's residual functional

capacity ("RFC") as follows:

> [Plaintiff] had the residual functional capacity to perform light work as defined in
> 20 CFR 404.1567(b) except he can lift 20 pounds occasionally, and 10 pounds
> frequently. He can stand and walk 6 hours out of 8, and sit 6 hours out of 8. He
> can push and pull 10 pounds occasionally. He can constantly use foot pedals and
> ramps and stairs. He can climb no ladders, ropes, and scaffolds, constantly balance,
> occasionally stoop, and constantly kneel and crouch. He can occasionally crawl.
> He also has the following manipulative limitations: left upper extremity no
> reaching overhead, all other maneuvers are occasional; right upper extremity no
> reaching overhead, all other maneuvers are constant. He can constantly engage in
> bilateral handling, fingering, and feeling. He has no visual communication
> limitations. He should avoid entirely dangerous moving machinery, unprotected
> heights. He can do tasks that take 1-3 months to learn, and simple routine tasks that
> have no high production quota pace work, and should not involve confrontation,
> supervision, negotiation or commercial driving. He should have only superficial
> interaction with the public and coworkers. This does not include contact of a short
> duration over 5 minutes per person and for a definite purpose.

(R. at 23.)

---

perform his or her past relevant work?

5.      Considering the claimant's age, education, past work experience, and residual
functional capacity, can the claimant perform other work available in the national
economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster
v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

Relying on the VE's testimony, the ALJ concluded that through the date last insured, Plaintiff was unable to perform any past relevant work. (R. at 27.) The ALJ found that considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (R. at 17.) He therefore concluded that Plaintiff was not disabled under the Social Security Act from June 30, 2010, the alleged onset date, through September 30, 2015, the date last insured. (R. at 29.)

## V.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley*

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.   ANALYSIS

Plaintiff puts forth two assignments of error.  First, Plaintiff asserts that the ALJ failed to address, acknowledge, or consider multiple opinions from acceptable medical sources.  (ECF No. 11, at pg. 7.)  Second, Plaintiff asserts that the ALJ failed to consider his medically determinable impairment of obesity under SSR 02-1P.  (*Id.* at 11.)

### A.  Mental Health Sources

An ALJ is required to "evaluate every medical opinion" against a variety of factors, including the nature of the treatment relationship, the supporting medical basis for the opinion, and the overall consistency with the record as a whole.  20 C.F.R. §§ 404.1527(d) and 416.927; *Norris v. Comm'r of Soc. Sec.*, 461 Fed. App'x 433, 438-39 (6th Cir. 2012.).  An opinion from a treating source is "accorded the most deference by the Social Security Administration because of the 'ongoing treatment relationship' between the patient and the opining physician." *Id.* (quoting *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007)).

Nontreating sources who physically examine a claimant but who do not have or did not have an ongoing treatment relationship with the claimant fall next along the continuum in terms of weight.  *Id.* (citing *Smith*, 482 F.3d at 875).  Finally, a nonexamining source who provides an

opinion "based solely on the review of the patient's existing medical records [] is afforded the least deference." *Id.* (citing *Smith*, 482 F.3d at 875); *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) ("As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination."). "With regard to nontreating, but examining sources, the agency will simply generally give more weight to the opinion of a source who has examined the claimant than to the opinion of a source who has not examined him." *Ealy v. Comm'r of Soc. Sec.*, 494 F.3d 504, 514 (6th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(1) and *Smith*, 482 F.3d at 875) (internal quotations omitted).

Here, Plaintiff asserts that the ALJ failed to "address, acknowledge, or consider" the opinions of Dr. Odor, Dr. Stoeckel, and Dr. Koricke. (ECF No. 11, at pg. 7–8.) All three of these sources would be considered "nontreating," because each examined Plaintiff for his or her evaluation, along with Plaintiff's records, but did not treat or evaluate Plaintiff beyond the single visit. (R. at 1116–21, 1123–28, 1130–36.) Plaintiff's assertion that the ALJ did not acknowledge these reports is incorrect. Although the ALJ did not mention any of the three doctors by name, he refers to the results of Dr. Odor and Dr. Stoeckel's evaluations. For example, the ALJ notes the following about Dr. Odor's evaluation:

> In February of 2014, the claimant presented for an independent psychological exam related to his Worker's Compensation claim. He reported being easily aggravated and monthly panic attacks. However, he had logical, coherent and goal-directed thought process, with clear speech. He was friendly, oriented, and had appropriate behavior. His affect was mildly restricted in range, and he had [a] limited fund of information. However, he was also noted to be possibly magnifying his symptoms.

(R. at 25.) The ALJ notes the following about Dr. Stoeckel's evaluation:

> The claimant presented for an additional Worker's Compensation psychological evaluation in January of 2015. He reported fatigue, feelings of worthlessness, and social isolation. However, his findings on exam were generally unchanged.

(*Id.*)  Accordingly, Plaintiff's argument fails regarding Dr. Odor and Dr. Stoeckel because the ALJ addressed the two evaluations and did not err in his treatment of the two evaluations.

Plaintiff is correct that the ALJ does not mention Dr. Koricke or the results of her evaluation.  Her evaluation, however, took place on September 27, 2016, almost a year after Plaintiff's date last insured of September 30, 2015.  (R. at 29, 1130–36.)  Dr. Koricke, therefore, did not complete the evaluation within the relevant time period.  For post-expiration evidence to be relevant to the disability decision, it "must relate back to the claimant's condition prior to the expiration of [his or her] date last insured."  *Kingery v. Comm'r of Soc. Sec.*, 142 F. Supp. 3d 598, 602 (S.D. Ohio Sept. 14, 2015) (quoting *Wirth v. Comm'r of Soc. Sec.*, 87 F. App'x 478, 480 (6th Cir. 2003)).

Dr. Koricke specifically indicated that her findings were based on the evaluation of Plaintiff on September 27, 2016.  (R. at 1134 ("The basis for [the] psychological opinion is largely based on presentation at the time of the evaluation."), 1136 ("At the time of this evaluation, [Plaintiff] would not be an appropriate candidate for vocational rehabilitation[.]").)  She did not attempt to evaluate his condition during his insured period.  (*Id.*)  Accordingly, the ALJ did not err by not referencing Dr. Koricke's evaluation.  *See Hauck v. Comm'r of Soc. Sec.*, No. 2:16-cv-970, 2017 WL 3276019, at *4 (S.D. Ohio August 2, 2017) ("Although consideration of evidence obtained after the date last insured is not prohibited, such evidence is only relevant to the extent that it relates back to the claimant's condition prior to the expiration of his date last insured.") (citation and quotations omitted); *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004) ("Evidence of disability obtained after the expiration of insured status is generally of little probative value.") (citation omitted); *Weetman v. Sullivan*, 877 F.2d 20, 22 (6th Cir. 1989) (deterioration in the claimant's condition after the period of eligibility is irrelevant).

In any event, "it is well settled that an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (internal quotation marks and citation omitted). Plaintiff seemingly assumes that because the ALJ did not directly name Dr. Koricke, he must not have considered her report. Yet, and ALJ is not required to discuss every piece of evidence. *Morgan v. Astrue*, No. 3:10cv00299, 2011 WL 3714781 at *9 (S.D. Ohio July 20, 2011) (holding that ALJ is not required to discuss all the evidence submitted, and ALJ's failure to cite to specific evidence does not indicate that it was not considered") (quoting *Simons v. Barnhart*, 114 Fed. Appx. 727, 733 (6th Cir. 2004)) (report and recommendation adopted by *Morgan v. Comm'r of Soc. Sec.*, No. 3:10-cv-299, 2011 WL 3739022 (S.D. Ohio Aug. 24, 2011)). The Court of Appeals for the Sixth Circuit does not require an ALJ to discuss explicitly his evaluation of evidence from consulting physicians. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d F.3d 504, 514 (6th Cir. 2010) (noting requirement to provide good reasons for weight given to opinions "only applies to treating sources"); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873 (6th Cir. 2007) ("SSA requires ALJs to give reasons for only treating sources") (emphasis in original).

The ALJ's analysis makes clear that he assessed the entire record. The absence of explicit language in the decision addressing Dr. Koricke's post-date last insured opinion does not amount to reversible error. It is therefore **RECOMMENDED** that Plaintiff's contention of error based on the ALJ's acknowledgement of the evaluations by Dr. Odor, Dr. Stoeckel, and Dr. Koricke be **OVERRULED**.

**B. Obesity**

Social Security Ruling 02-1p[2] addresses the evaluation of obesity for the purpose of disability claims. The Ruling assures that the Commissioner will consider a claimant's obesity in evaluating steps two through five of the sequential analysis. SSR 02-1p, 2000 WL 628049, at *3 (Sept. 12, 2002). When the medical or clinical records display a consistently high body weight or body mass index ("BMI") an ALJ will typically rely on his or her "judgment to establish the presence of obesity based on the medical findings and other evidence in the case record, even if a treating or examining source has not indicated a diagnosis of obesity." *Id.* Obesity will qualify as a severe impairment pursuant to step two when "alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." *Id.* at *4. "[N]o specific level of weight or BMI . . . equates with a 'severe' or 'not severe' impairment." *Id.* The ALJ "will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe." *Id.*

Ruling 02-1p further recognizes that obesity may contribute to and complicate "chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems." *Id.* at *3. The Ruling also cautions against making "assumptions about the severity or functional effects of obesity combined with other impairments" and stresses that "[o]besity in combination with another impairment may or may not increase the severity of functional limitations of the other impairment." *Id.* at *6.

---

[2] SSR 02-1p was rescinded and replaced by SSR 19-2p, effective May 20, 2019. Here, because Plaintiff filed his claim filed prior to the effective date, SSR 02-1P still applies in this case.

The United States Court of Appeals for the Sixth has emphasized that "Social Security Ruling 02-01p does not mandate a particular mode of analysis." *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding, in case where medical reports described claimant as morbidly obese, that "the ALJ does not need to make specific mention of obesity if he credits an expert's report that considers obesity."); *see also Young v. Comm'r of Soc. Sec.*, No. 3:09 CV 1894, 2011 WL 2182869, at *7 (N.D. Ohio June 6, 2011) ("The Sixth Circuit requires the ALJ to mention obesity either expressly or indirectly where the record includes evidence of obesity's effects on the claimant's impairments."). Rather, Social Security Ruling 02-01p "only states that obesity, in combination with other impairments, 'may' increase the severity of the other limitations." *Bledsoe*, 165 F. App'x at 412. Furthermore, when the record contains only a limited amount of information concerning obesity, the Sixth Circuit has indicated that an ALJ may provide less articulation. *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (holding that when the claimant failed to list obesity in his application and when there was scant evidence of obesity in the record, it was sufficient for the ALJ to merely acknowledge the obesity diagnosis in his decision).

Finally, pursuant to the regulations, a claimant "must furnish medical and other evidence that [the Commissioner] can use to reach conclusions about your medical impairment(s) and, if material to the determination of whether you are blind or disabled, its effect on your ability to work on a sustained basis." 20 CFR § 404.1512. Accordingly, a claimant relying on obesity should provide evidence that obesity affected his or her ability to work. *See Cranfield v. Comm'r, Soc. Sec.*, 79 F. App'x 852, 857–58 (6th Cir. 2003) (concluding that even though doctor reports indicated obesity, the claimant's failure to provide evidence that her obesity affected her ability to work meant that "the ALJ and the district court had no obligation to address [her]

obesity"); *see also May v. Astrue*, No. 4:10CV1533, 2011 WL 3490186, at *6 (N.D. Ohio June 1, 2011) (holding that an ALJ had no obligation to address a claimant's obesity when, even though the record contained a diagnosis of obesity, he did not demonstrate "functional limitations ascribed to the condition[]").

In the instant case, Plaintiff asserts that the ALJ failed to consider Plaintiff's obesity under SSR 02-1p. (ECF No. 11, at pg. 11.) The ALJ does not include a discussion of Plaintiff's weight in his decision. (*See* R. at 19–29.) Plaintiff, however, does not direct the Court to any medical evidence indicating that Plaintiff's obesity impacted his ability to perform work or other tasks. (*See* ECF Nos. 11 & 17.) Instead, Plaintiff asserts that the record demonstrates his obesity is a "medically determinable impairment," because Plaintiff's BMIs have been in the "obese" range according to SSR 02-1p. (ECF No. 11, at pg. 12–13.) Yes, Plaintiff fails to demonstrate that his weight affected his functioning. Nothing in the records shows that his weight influenced his ability to function. Plaintiff has not demonstrated that the ALJ erred in his assessment of Plaintiff's RFC with regard to his obesity. *See Griffin v. Comm'r of Soc. Sec.*, No. 1:13-cv-594, 2014 WL 2442109 at *3 (S.D. Ohio May 30, 2014) (finding no reversible error in not explicitly considering obesity's combined effect where plaintiff did not provide evidence that obesity affected her ability to work).

Specifically, while the record demonstrates that Plaintiff was described as obese in some medical reports, no evidence suggests that Plaintiff's obesity contributed to his limitations. In fact, Plaintiff's weight was described in a variety of ways including "normal weight," "somewhat overweight," "overweight," and "obese." (*See, e.g.*, R. at 780, 841, 854, 879, 944, 985, 1009, 1031, 1036, 1149, 1230.) The evidence indicates that Plaintiff was roughly seventy inches tall and varied in weight during the relevant time period between approximately 220 and 255

pounds. (*See, e.g.*, R. at 49, 63–64, 387, 564, 618, 773, 779, 813, 818, 826, 839, 885, 1034, 1037, 1104, 1108–09, 1123–28, 1132, 1142, 1162, 1166.) Additionally, the record indicates that Plaintiff's BMI ranged from 32.72 kg/meters squared to 40.77 kg/meters squared. (*See, e.g.*, R. at 564, 872, 879, 920, 935, 1048, 1050, 1052, 1054, 1059, 1061, 1063, 1065, 1067, 1070, 1072, 1080–81, 1084, 1087, 1090–91, 1217–18, 1221–22.)

Even though the ALJ did not explicitly address Plaintiff's weight or obesity in his decision, as detailed above, no particular weight or BMI amounts to a severe impairment. The ALJ was not required to assume without evidence that obesity was affecting Plaintiff's other impairment. Under the circumstances of this case, the ALJ was not obligated to further address obesity. *See Young*, 2011 WL 2182869, at *9 ("[B]ecause there is not a single diagnosis of obesity in the record, and because Plaintiff failed to furnish evidence as to how his obesity affected his ability to work, the ALJ was not required to give obesity any express consideration in the report."); *cf. also Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (holding that ALJ did not err in failing to consider obesity where the claimant did not list obesity as an impairment, did not provide physician evidence describing her as obese, and failed to present medical opinion evidence that her weight imposed additional limitations or exacerbated her other conditions).

Even assuming the record evidence was sufficient to create a duty for the ALJ to address obesity, given the lack of evidence that obesity was exacerbating Plaintiff's conditions, any failure to address the matter more fully was harmless error in this case. *See Callicoatt v. Astrue*, 296 F. App'x 700, 702 (10th Cir. 2008) (finding that even if reference to weight in the medical record created an affirmative duty to consider obesity, failure to do so was harmless error when the claimant provided "no evidence . . . showing that her obesity exacerbated her other

impairments"); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (holding that although references to weight should likely have alerted the ALJ to the claimant's obesity, an ALJ's failure to explicitly consider obesity was harmless when the claimant failed to "specify how his obesity further impaired his ability to work").

Plaintiff argues that he is not required to point to specific limitations associated with his obesity, but that the ALJ must classify his obesity as severe or non-severe because it qualifies as a medically determinable impairment. (ECF No. 17, at pg. 4.) This argument is without support. It is Plaintiff's burden to establish his medical impairments. *Rabbers*, 582 F.d at 651. Here, Plaintiff points to no relevant evidence in the medical record showing that his obesity exacerbated his other impairments. *See, e.g.*, *Stewart v. Comm'r of Soc. Sec.*, No. 4:11-cv-224, 2011 WL 3862151, at *4 (N.D. Ohio August 4, 2011) ("There is simply no basis to conclude the ALJ erred in failing to specifically discuss Plaintiff's obesity, where Plaintiff herself failed to do so, much less present any evidence that this condition contributed to her alleged disability."); *Young*, 2011 WL 2182869, at *9 (finding ALJ was not required to give obesity express consideration where plaintiff failed to allege obesity as an impairment or provide evidence); *May*, 2011 WL 3490186 at *6 (noting that 20 C.F.R. § 404.1512(a) requires a plaintiff to "furnish medical and other evidence that [the Social Security Administration] can use to reach conclusions about his medical impairment(s) and ... its effect on his ability to work on a sustained basis."); *Murphy v. Sec'y of Health & Human Servs.*, 801 F.2d 182, 185 (6th Cir. 1986) ("Plaintiff must prove that the impairment is severe and that it significantly limits his ability to perform basic work activities.").

It is therefore **RECOMMENDED** that Plaintiff's contention of error based on the ALJ's failure to discuss his obesity in the administrative decision be **OVERRULED**.

## VII. CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to

specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: July 29, 2019                                               */s/ Elizabeth A. Preston Deavers*
                                                   **ELIZABETH A. PRESTON DEAVERS**
                                                   **CHIEF UNITED STATES MAGISTRATE JUDGE**